# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Richmond Division

KEVIN DOHERTY,                     )
                                   )
    Plaintiff,                 )
                                   )
v.                                 )       Civil Action No. 3:19CV420–HEH
                                   )
CORIZON HEALTH, *et al.*,          )
                                   )
    Defendants.                )

## MEMORANDUM OPINION
### (Granting Motion for Summary Judgment)

Kevin Doherty, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil rights action. Proceeding on his Third Particularized Complaint ("Complaint," ECF No. 80), Doherty alleges that, while he was an inmate at the Arlington County Detention Facility ("ACDF"), Defendants[1] provided him with constitutionally inadequate medical care for his deep vein thrombosis ("DVT"). (*Id.* at 1.)[2] At this stage, a single claim against Dr. Ashby remains:

---

[1] Doherty names as defendants: Corizon Health ("Corizon"), "the medical service provider for inmates at ACDF;" Corizon's Chief Executive Officer, James Hyman ("Hyman"); Richard Ashby ("Dr. Ashby"), "the medical doctor tasked with providing care [for] inmates at ACDF;" Danbi Mallin ("PA Mallin"), a physician's assistant at ACDF; Majorie Burris ("Nurse Burris"), a nurse at ACDF; Beth Arthur ("Sheriff Arthur"), the Sheriff of Arlington County; and Arlington County, Virginia, the municipality in which the ACDF is located. (ECF No. 80, at 1–2.) Doherty also listed the Virginia Department of Corrections ("VDOC") as a defendant, however, because the VDOC is not a "person" within the meaning of 42 U.S.C. § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), the Court dismissed any claims against the VDOC prior to authorizing the service of Doherty's Complaint. (*See* ECF No. 81, at 1.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system for the citations to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization and omits any emphasis and symbols in quotations from the parties' submissions.

Claim One        Dr. Ashby "had a duty to treat [Doherty's] serious medical need with proper medical care, which he failed to do when he intentionally [and] without medical prudence, delayed . . . testing [for and] treatment of [Doherty's] . . . DVT . . . [for] 35 days." (*Id.* at 5–6.)[3]

The matter is now before the Court on Dr. Ashby's Motion for Summary Judgment. (ECF No. 124.) Doherty has filed several documents in response. (*See* ECF Nos. 146, 147, 148.) For the reasons stated below, the Motion for Summary Judgment (ECF No. 124) will be granted. Claim One and the action will be dismissed.

## I. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

---

[3] By Memorandum Opinion and Order entered on May 28, 2021, the Court dismissed the claims against Corizon, Hyman, PA Mallin, Nurse Burris, and Arlington County. (ECF Nos. 117–18.) By Memorandum Opinion and Order entered on June 16, 2021, the Court dismissed the claim against Sheriff Arthur. (ECF Nos. 122–23.)

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).[4]

In support of his Motion for Summary Judgment, Dr. Ashby has submitted: (1) two of his own sworn statements ("First Ashby Declaration," ECF No. 125–1; "Second Ashby Declaration," ECF No. 125–3); and, (2) two hundred and seventy-two (272) pages of Doherty's medical records (ECF No. 125–2).

---

[4] Doherty incorrectly asserts that this Court "has an obligation to search the entire record before determining whether to grant . . . summary judgment." (ECF No. 147, at 1 (citation omitted).) To the contrary, "[t]he court need consider only the *cited* materials" in deciding a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(3) (emphasis added).

In opposition to the Motion for Summary Judgment, Doherty has submitted:

(1) his own sworn statement ("Doherty Declaration," ECF No. 146); (2) the sworn

statement of fellow ACDF inmate Miguel Miango[5] ("Miango Declaration," ECF No. 147,

at 4–6); and, (3) an affidavit from his mother, Nancy Miller, which includes

approximately one hundred and twenty-one (121) pages of attached documents,

including, among other things, Ms. Miller's notes, Ms. Miller's resume, what appear to

be print-outs of various medical publications, and medical records that appear to pertain

to Doherty ("Miller Affidavit," ECF No. 146–1).[6]

At this stage, the Court is tasked with assessing whether Doherty "has proffered

sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof

of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)

(emphasis added). As discussed below, there are multiple issues with the documents that

Doherty has submitted in opposition to the Motion for Summary Judgment.

---

[5] Miango styled his submission as an "affidavit," however, it was not notarized. A document can be notarized in two primary ways. An acknowledgment is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn to the truth of the contents of the document. In an acknowledgment, unlike a jurat, the affiant does not swear under oath nor make statements under penalty of perjury. *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that jurat uses words "subscribed and sworn" and demonstrates an oath was rendered); *Goode v. Gray*, No. 3:07cv189, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009). Because Miango's submission had neither an acknowledgment, nor a jurat, nor any other indication that it was ever presented to a notary public, the Court will not accept it as an affidavit. *See Robinson v. Fenner*, No. 3:18CV117–HEH, 2021 WL 771753, at *2 n.4 (E.D. Va. Feb. 26, 2021). However, because Miango swore to its contents under penalty of perjury, the Court will accept it as a declaration. *See id.*

[6] Doherty has also submitted a Memorandum on Summary Judgment Evidence (ECF No. 147, at 1–3), Plaintiff's Statement of Disputed Factual Issues (ECF No. 148, at 1–3), and a Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (ECF No. 148, at 4–25). None of these submissions were notarized or sworn to under penalty of perjury; consequently, they do not constitute admissible evidence. *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

To begin with, the affidavit submitted by Doherty's mother is inadmissible. While Ms. Miller did present her affidavit to a notary public, the statement signed by the notary public merely says: "[p]ersonally appeared before me on this 9th day of August, the above named Nancy Miller." (ECF No. 146–1, at 3.) Because this statement does not contain the words "subscribed and sworn," it is not a jurat. *See Strong*, 495 F.3d at 140. Thus, the notary's statement is insufficient to show that Ms. Miller swore to the contents of the document under penalty of perjury. *Id.* At most, this language could be construed as an acknowledgment. *See id.* However, an acknowledgment is insufficient to convert this document into admissible evidence because it does nothing more than verify that Ms. Miller was the person that signed the document. *Id.*

Similarly, the Miller Affidavit cannot be admitted as a declaration. Ms. Miller signed her affidavit with the following verification: "I swear these facts are true and accurate as best as I can recall and supported with my attached notes." (ECF No. 146–1, at 3.) This language is problematic for at least two reasons.

First, it is unclear whether Ms. Miller has actual first-hand knowledge of the facts that she purports to testify to, or whether, she is merely reciting things that she long ago wrote down, but currently cannot recall. *See Causey v. Balog*, 162 F.3d 795 803 n.4 (4th Cir. 1998) (citations omitted) ("Because [the court] cannot assess whether [Ms. Miller] had first hand knowledge of [the alleged] facts or whether [s]he is competent to testify to them, [the court] cannot consider them in [its summary judgment] review.").

Second, and more importantly, Ms. Miller failed to include any language in her verification to indicate that she was swearing to the contents of her affidavit under

penalty of perjury. In the absence of a jurat, Ms. Miller's failure to include these critical words renders her entire submission inadmissible. *See White*, 366 F.3d at 300.[7]

Further, because the Miller Affidavit is inadmissible, the unauthenticated documents attached to it are likewise inadmissible. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (citation omitted) (observing that "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment"); *Campbell v. Verizon Va., Inc.*, 812 F. Supp. 2d 748, 750 (E.D. Va. 2011) (quoting *Orsi*, 999 F.2d at 92) ("For documents to be considered, they 'must be authenticated by and attached to an affidavit' that meets the strictures of Rule 56.").

As for their respective submissions, both Doherty and Miango made their declarations under penalty of perjury. (*See* ECF No. 146, at 8; ECF No. 147, at 6.) However, that does not end the analysis. The facts offered by an affidavit or sworn declaration must also be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be

---

[7] The above-referenced issues with the Miller Affidavit are by no means an exhaustive list. A review of the entire document makes clear that other issues exist that might otherwise cause the Court to exclude said document, either in whole, or in part. For instance, neither Ms. Miller, nor the notary includes the complete date on which Ms. Miller signed the document. (ECF No. 146–1, at 1–3.) While the notary's statement does indicate that Ms. Miller signed the document on "August 9th," it does not indicate the year in which it was signed. (*Id.* at 3.) Thus, even if Ms. Miller had included the words "under penalty of perjury," in her verification, the omission of this information, as a practical matter, would arguably allow her to "avoid the possibility of perjury," as it would be nearly impossible to prove when she made the statements. *Cf. Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (observing that where a party includes qualified language in a verification it "is insufficient for the purposes of opposing a motion for summary judgment because such verification avoids the possibility of perjury"). The Court need not consider this issue any further, however, as the Miller Affidavit is clearly inadmissible under any analysis.

conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted). The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting a summary judgment analysis. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted). Both men's declarations suffer from issues in this regard. The Court will address each in turn.

Miango makes several statements that are of no value in assessing the propriety of summary judgment. For instance, he frequently repeats things that Doherty and another inmate, a jailed doctor, told him about the treatment that Doherty was receiving at the ACDF. (Miango Decl. ¶¶ 6, 8–10, 12.) However, Miango fails to establish that he has an independent basis for knowing these "facts." *See Clay Printing Co*, 955 F.2d at 945 n.9. Miango also speculates that unidentified staff at the ACDF tried to "punish" Doherty, "or at the least limit his ability to effectively sue the [ACDF]," when they transferred Doherty to the VDOC. (*Id.* ¶ 13.) Miango's hearsay statements and conclusory speculation are clearly inadmissible and cannot serve to create a genuine dispute of material fact. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) ("[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment").

Doherty's Declaration is similarly deficient. First, Doherty details conversations that he had with his mother about the treatment that he was receiving at the ACDF, as well as her efforts to contact the ACDF on his behalf. (Doherty Decl. ¶¶ 17, 30–32.) In addition to being largely irrelevant, Doherty's conversations with his mother are hearsay

and cannot be admitted for the truth of the matter asserted. *Roane*, 378 F.3d at 400–01. In that same vein, Doherty's conversations with a jailed doctor concerning the treatment that Doherty was receiving at the ACDF, (*see* Doherty Decl. ¶ 18), are likewise inadmissible hearsay. *Roane*, 378 F.3d at 400–01.

Doherty also makes statements concerning his medical condition and history. (*See, inter alia*, Doherty Decl. ¶¶ 2–5, 14–15, 20, 26–28, 38–39.) However, he does not attach any medical records to his declaration. Doherty is not competent to testify about the cause of any medical conditions, as he is not a medical expert. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001). Further, Doherty may not interpret medical tests or give a "lay opinion" concerning medical issues. *Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan J., concurring) (explaining that a layperson's interpretation of medical tests or "speculation regarding the causes" of a condition "constitute conclusory and inadmissible lay opinion"). Because Doherty is not competent to diagnosis himself, interpret medical tests, or offer a lay opinion, it is clear that most of the medical history that he provides is simply a recitation of things that others have told him. Thus, in the absence of properly authenticated medical records, Doherty's statements concerning his medical history are inadmissible hearsay. *Roane*, 378 F.3d at 400–01.[8]

Doherty also alleges in his declaration that several of his medical records appear to have been edited. (Doherty Decl. ¶¶ 11–12, 23–24, 29.) However, Doherty has not established that he is an expert in the field of medical record keeping, nor has he

---

[8] To the extent Doherty offers lay opinion about his medical condition or hearsay concerning his medical history, the Court will not consider those statements for the truth of the matter asserted. However, as warranted under the circumstances, the Court may consider such statements for the limited purpose of showing that Dr. Ashby had notice of certain possible conditions.

submitted any affidavit from such an expert to say that the medical records in question are anything less than genuine. As such, Doherty's statements on this point are nothing more than conclusory speculation based upon his own subjective beliefs. Consequently, they will not be considered on summary judgment. See *Roane*, 378 F.3d at 400–01.

Doherty also generally suggests that the Court should examine and consider "THE MERK MANUAL" and "PRISON LEGAL NEWS," as he contends that they "directly contradict [Dr. Ashby's] medical assessment methods." (ECF No. 147, at 2.) However, neither Doherty, nor anyone else, has properly authenticated and attached a copy of either document to an affidavit complying with the strictures of Rule 56. *See Orsi*, 999 F.2d at 92 (citation omitted); *Campbell*, 812 F. Supp. 2d at 750 (citation omitted). Nor has Doherty provided specific citations to either document that he wishes for the Court to consider. (ECF No. 147, at 2.) As discussed above, it is simply not the duty of this Court to scour the record to find information favorable to Doherty. *See Forsyth*, 19 F.3d at 1537 (citation omitted); *see also* Fed. R. Civ. P. 56(c)(3). Accordingly, the Court will not consider either document on summary judgment.[9]

Finally, Doherty vaguely suggests that "Defendant's submitted materials . . . have not been authenticated." (ECF No. 147, at 2.) However, Doherty does not specify which of the "Defendants" he is referring to, nor does he describe which "materials" he believes were not properly authenticated. (*Id.*) While the Court would, of course, not accept

---

[9] Even if Doherty had properly authenticated these documents, attached them to a conforming affidavit, and provided adequate citations, they would nevertheless be inadmissible as hearsay. *See Perry v. Jones*, No. 3:14CV71, 2016 WL 2747262, at *2 (E.D. Va. May 10, 2016) (citations omitted) (noting that only medical articles submitted in conjunction with expert testimony fall within the learned treatise exception to the hearsay rule); *see also Gantt v. Whitaker*, 57 F. App'x 141, 150 (4th Cir. 2003) (citation omitted) (observing that newspaper articles are inadmissible hearsay when offered for the truth of the matter asserted therein).

unauthenticated materials from any of the Defendants any more than it would accept them from Doherty, Doherty's position is woefully undeveloped and totally lacking in specificity. (*Id.*) Given that Dr. Ashby is the only defendant remaining at this time, the Court can only presume that Doherty is referring to the evidence submitted by Dr. Ashby. As discussed above, the documents submitted by Dr. Ashby were his own affidavits and Doherty's medical records. (*See* ECF Nos. 125–1, 125–2, 125–3). A review of these documents indicates no obvious impropriety, despite Doherty's vague and conclusory claim to the contrary. Accordingly, the Court overrules what can most generously be described as Doherty's general objection to Dr. Ashby's evidence.[10]

As discussed below, the parties' respective accounts of what occurred diverge in a few ways that should be highlighted. The Court first sets forth the undisputed facts and then summarizes the relevant facts that are in dispute. All permissible inferences are drawn in favor of Doherty.

## II. SUMMARY OF RELEVANT FACTS

### A. Undisputed Facts

"Signs and symptoms of a DVT include swelling in the affected leg, calf pain or tenderness, red or discolored skin on the leg, warmth in the leg, and lack of pedal pulse." (First Ashby Decl. ¶ 9.)[11] A DVT is a serious condition "because blood clots in the veins

---

[10] While the Court liberally construes *pro se* pleadings, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it will not act as an inmate's advocate and develop claims that were not clearly presented. *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) ("District judges are not mind readers . . . [and] cannot be expected to construct full blown claims from sentence fragments . . . .").

[11] The Court omits references to secondary sources in citations to the summary judgment record, unless otherwise noted.

can break loose, travel through the blood stream and lodge in the lungs and block blood flow, which is a P[ulmonary] E[mbolism] [("PE")]." (*Id.*) "Signs of a PE include sudden shortness of breath, chest pain or discomfort that worsens when taking a deep breath or cough, lightheadedness or dizziness, rapid pulse, and coughing up blood." (*Id.* ¶ 19.)

On March 18, 2019, after having been immobile with the flu, Doherty began to suspect that he might have a DVT in his left leg. (Doherty Decl. ¶ 3.) Doherty showed his left calf to a deputy and was sent to the medical unit around 11:00 a.m. (*Id.* ¶¶ 6–8.) At around 2:35 p.m., Doherty was seen by Nurse Toy. (*Id.* ¶ 8.) Doherty told her that, based on prior experiences, he suspected he might have a DVT in his left calf. (*Id.* ¶ 9.) Nurse Toy referred Doherty to Dr. Ashby at around 2:47 p.m. (*Id.*) At around 4:30 p.m., Doherty was seen by Dr. Ashby. (*Id.* ¶ 13.)

Doherty told Dr. Ashby that he suspected a DVT in his left leg. (First Ashby Decl. ¶ 10.) He reported "pain and cramping" over the last 24 hours and "some difficulty walking with some weakness and numbness." (*Id.*) Doherty said that "he had a DVT and PE in 2012 but discontinued long term anticoagulation [medicine] in 2013." (*Id.*) He said that his prior DVTs had been in his calf. (*Id.*) Dr. Ashby observed that:

> [Doherty] was alert and in no acute distress. He walked with a mild antalgic gait. On examination, his lungs were clear. [Dr. Ashby] examined [Doherty's] thigh. There was tenderness of the medial portion of the left thigh . . . . [Dr. Ashby] did not believe [Doherty] had a DVT. [Dr. Ashby] assessed a strain of the left quadriceps muscle, fascia and tendon, and an acute upper respiratory infection (URI). [Dr. Ashby] prescribed ibuprofen, Loratadine (Claritin), Benzonatate for cough, and Robaxin for muscle spasms and pain. [Dr. Ashby] instructed [Doherty] to follow up with [PA Mallin] on April 1, 2019. [Dr. Ashby] ordered hotpacks daily to apply to [Doherty's] thigh for ten days."

(*Id.*) Doherty requested an ultrasound that was not performed. (Doherty Decl. ¶ 16.)

On March 30, 2019, Doherty saw PA Mallin. (First Ashby Decl. ¶ 11.) Doherty "complained of continued cough and URI symptoms." (*Id.*) "PA Mallin performed an exam of the lower extremities." (*Id.*) *Inter alia*, she "noted positive pulses 2+ bilaterally." (*Id.*) "PA Mallin concluded there was no evidence of DVT. She assessed bronchitis and prescribed an antibiotic and an expectorant to loosen mucus." (*Id.*)

> On April 10, 2019, Doherty
>
> submitted a Health Services Request ("HSR") stating that, due to delayed medical response, he now had clots in his lungs. He wrote that they were painful at night due to sleeping on a thin mattress. He submitted another HSR on April 21, 2019, stating he still believed he had a DVT in his left calf and may have one in his lung. He reported he was still coughing after five weeks. He also wrote that his left calf and foot were very swollen and he had a headache.

(*Id.* ¶ 12.)

> On April 22, 2019, Dr. Ashby
>
> saw [Doherty] for his complaints of continued dry cough with occasional wheeze. He reported no history of asthma. He also reported he had a lot of sneezing with runny nose and chills yesterday, but no fever. In addition, he still had concerns about a blood clot in his left leg. On examination, [Doherty] was alert, in no acute distress, with normal gait and mobility. His lungs had a mild expiratory wheeze. [Dr. Ashby] examined [Doherty's] lower extremities and his left calf had tenderness with slight swelling. [Dr. Ashby] assessed allergic rhinitis due to pollen, mild intermittent asthma, and pain in left leg. [Dr. Ashby] prescribed aspirin, Loratadine (Claritin), Ventolin (albuterol), and Montelukast Sodium (Singulair). [Dr. Ashby] also ordered a duplex scan of the extremity veins in both legs and a follow-up after the scan.

(*Id.* ¶ 13).

On April 23, 2019, Doherty "had a venous lower bilateral extremity Doppler, which confirmed the DVT of the left lower extremity." (*Id.* ¶ 15.) On April 24, 2019, Dr. Ashby reviewed the results and "prescribed Eliquis, an anticoagulant." (*Id.* ¶ 16.)

"DVTs are most commonly treated with anticoagulants, or blood thinners." (*Id.*)  Dr. Ashby opted for this treatment to prevent the clot from growing, and to reduce the risk of new clots developing. (*Id.*)  Dr. Ashby opted not to prescribe a thrombolytic medication, commonly known as a "clot buster," because they require an IV line and catheter and can cause serious bleeding. (*Id.*)

Dr. Ashby did not meet with Doherty in person "to explain [his] condition or the medication he prescribed." (Doherty Decl. ¶ 25.)  Further, Doherty did not actually receive his "first dose [of Eliquis] until around 4/30/19." (*Id.* ¶ 22.)

On May 18, 2019, Doherty saw RN Akame Ekwe ("RN Ekwe") "for sick call regarding an HSR he submitted requesting pain medications and an extra mattress due to what he called PEs." (First Ashby Decl. ¶ 17.)  RN Ekwe examined Doherty and noted that his "straight leg raise was equal and strong," his "posture was erect and his gait symmetrical," he "was able to walk heel to toe and squat and rise," and he "did not appear to be in any distress." (*Id.*)  RN Ekwe "provided ibuprofen and scheduled a follow-up appointment with [Dr. Ashby] for double mattress approval." (*Id.*)

Dr. Ashby saw Doherty on May 22, 2019. (*Id.* ¶ 18.)  Doherty was not in respiratory distress and his vital signs were normal. (Second Ashby Decl. ¶ 7.)  Dr. Ashby concluded that Doherty did not have a PE at that time. (*Id.*)  "The shortness of breath from a PE would have been much more pronounced" than anything Doherty displayed while at the ACDF. (*Id.* ¶¶ 6–7.)  Nevertheless, Doherty "requested an extra mattress to help his chest pain that he claimed was caused by his PE that occurred about five weeks prior." (First Ashby Decl. ¶ 18.)  Dr. Ashby told Doherty that "his rationale

13

for the extra mattress was bogus." (*Id.*) Doherty "then requested a business card and

ended the encounter." (*Id.*) This was last time Dr. Ashby saw Doherty as a patient. (*Id.*)

> On June 22, 2019, Doherty
>
> saw PA Mallin for a follow up of his DVT.  He was prescribed Eliquis and
> reported he was doing better but he was still having left shoulder blade pain
> and occasional shortness of breath.  He requested a CT scan of the chest
> due to having a reported history of PE twice.  He denied any current
> shortness of breath and stated he was able to exercise.  He also denied leg
> pain. PA Mallin noted that she performed a physical exam.  [Doherty] was
> in no distress.  His legs appeared normal and pedal pulses on the lower
> extremities were 3+ right and 2+ left, with no swelling.  PA Mallin assessed
> s/p (status-post) DVT of the left leg and chronic asthma, s/p bronchitis.[12]
> She ordered x-rays of the chest and another duplex scan of left [Lower
> Extremity].  PA Mallin noted that she would discuss the case with [Dr.
> Ashby], as [Doherty] was requesting a CT scan.  She noted to check the
> chest x-ray to rule out other lung condition for [Doherty's] chest wall pain.
> She encouraged [Doherty] to adhere to his current treatment.

(*Id.* ¶ 20.)[13]

On June 25, 2019, Doherty had a "venous lower left extremity Doppler, which

again showed the DVT in the left leg." (*Id.* ¶ 21.)  Doherty's chest x-ray, however,

"showed the lungs and pleural spaces were clear." (*Id.*)  "There is no indication that

[Doherty] had a PE while he was housed at [the] ACDF." (*Id.* ¶ 19.)  Doherty had none

of the symptoms of a PE. (*Id.*)  Dr. Ashby never observed Doherty in respiratory distress

and no nurse or other provider ever documented Doherty as being in respiratory distress.

---

[12] The term "status-post," or "s/p," for short, is a "clinical shorthand referring to a state that follows an intervention . . . or condition . . . ." *See Nelson v. Cross*, No. 8:14CV228, 2015 WL 11090367, at *7 n.7 (D. Neb. Oct. 28, 2015) (citations omitted).  Practically speaking, such a notation "indicates that a patient had a certain procedure or condition at some point in the past, i.e., his or her status is post (or after) having had a procedure or condition." *Id.*

[13] Dr. Ashby does "not recall speaking with PA Mallin after this visit regarding a CT scan, but [he] would have told her that a CT scan was not indicated because [Doherty] did not have signs or symptoms of a PE." (First Ashby Decl. ¶ 20.)

(Second Ashby Decl. ¶ 7.)  "A PE is an emergency condition and the symptoms would have been so severe that he would have been sent out to the hospital on an emergency basis." (First Ashby Decl. ¶ 19.)

On July 16, 2019, Doherty transferred out of the ACDF to the Nottoway Correctional Center.  (*Id.* ¶ 22.)  The treating physician there "ordered Eliquis and Singular (anti-inflammatory to treat asthma)." (*Id.*)  Doherty had a "preliminary medical screening, which noted the DVT left calf." (*Id.*)  On July 29, 2019, Doherty had a classification physical.  (*Id.* ¶ 23.)  Doherty's "general condition was good." (*Id.*)  Doherty "was [status-post] DVT." (*Id.*)

By August 2019, Doherty was receiving Eliquis twice daily.  (*Id.* ¶ 24.)  However, Doherty "did not show up for his 4:30 PM doses on August 7, 18, and 27." (*Id.*)

In September 2019, Doherty was transferred to Lunenburg Correctional Facility.  (*Id.* ¶ 25.)  There, Doherty missed his morning dose of Eliquis on September 10 and 11, as well as his afternoon dose on September 10.  (*Id.*)

Over the next few months, Doherty continued to miss his scheduled doses of Eliquis.  (*Id.* ¶¶ 27–31.)  In October 2019, Doherty missed two doses.  (*Id.* ¶ 27.)  In November 2019, Doherty missed one dose.  (*Id.* ¶ 28.)  In February 2020, Doherty failed to appear for six (6) doses of Eliquis.  (*Id.* ¶ 29.)  In March 2019, Doherty failed to appear for twenty-nine (29) doses of Eliquis.  (*Id.* ¶ 30.)

In April 2020, Doherty failed to appear for his morning doses of Eliquis on April 1, 3–21, and 29.  (*Id.* ¶ 31.)  He missed his afternoon doses on April 2, 3, 5–7, and 9–20.  (*Id.*)  Doherty also refused to take his morning doses on April 28 and 30.  (*Id.*)

15

On April 21, 2020, Doherty went to sick call complaining of pain in his lower right back beginning the night before. (*Id.* ¶ 32.) He said that his "core has been locked up," that he was having "stabbing pains when breathing," and that he was "unable to get a deep breath." (*Id.*) His heart rate and blood pressure were elevated, but his respiration rate and his temperature were normal. (*Id.*) A chest x-ray noted "questionable opacity in each lung." (*Id.*) Doherty was sent to the hospital. (*Id.*)

At the hospital, Doherty reported that he had stopped taking Eliquis three weeks ago. (*Id.* ¶ 33.) A CT scan was performed on Doherty's chest. (*Id.*) It revealed:

> [A] small amount of peripherally oriented thrombus within the proximal internal vasculature supplying the lower lobes which could reflect a small amount of chronic thrombus. There was also small thrombus seen within the segmental and subsegmental branches of the left lower lobe more distally which could reflect acute or chronic thrombus. The main pulmonary artery was normal in size and there was no evidence of right heart strain. Trace right pleural effusion was noted, as was mild bibasilar atelectasis. The patient was discharged with diagnoses of unspecified chest pain and other pulmonary embolism without acute cor pulmonale.

(*Id.*) Even after he was diagnosed with a PE on April 21, 2020, Doherty continued to miss scheduled doses of Eliquis in May, June, and July 2020 (*id.* ¶¶ 33, 35–38), despite being "told about the importance of taking Eliquis to treat [his] PE [and] to decrease [the] risk of stroke or death" (*id.* ¶ 33).

The symptoms that Doherty reported on the night of April 20, 2020, were indicative of a PE. (*Id.* ¶ 34.) However, Doherty did not report any such symptoms while at the ACDF. (*Id.*) In Dr. Ashby's medical opinion, the PE that was diagnosed on April 21, 2020, was a result of Doherty's failure to regularly take his prescribed Eliquis, "especially from February to April 2020, when numerous doses were missed." (*Id.*)

16

## B. Disputed Facts

While it is undisputed that Dr. Ashby met with Doherty on March 18, 2019, the parties disagree about whether Doherty's left leg was swollen or discolored at that time. Doherty maintains that on the date of this visit, his left calf "was swollen [and] colored." (Doherty Decl. ¶ 6.) Miguel Miango swears that he saw Doherty's left calf the following day, March 19, 2019, at which time, it had swollen to "about twice the size of his right calf [and was] reddish in color." (Miango Decl. ¶¶ 5, 7.)

Conversely, Dr. Ashby maintains that there was "no discernable swelling or color change in the leg." (Second Ashby Decl. ¶ 5.) As part of his examination, Dr. Ashby touched Doherty's leg "to ascertain swelling and dilated veins." (*Id.*) He explains that, "[i]f a vein is clotted, there is swelling below the spot of the blockage. However, there was no swelling" on March 18, 2019. (*Id.*) Dr. Ashby maintains that the first time he observed any swelling in Doherty's calf was on April 22, 2019, when he ordered a duplex scan of Doherty's legs. (First Ashby Decl. ¶¶ 13–14.)[14]

## III. ANALYSIS

In Claim One, Doherty alleges that Dr. Ashby "had a duty to treat [Doherty's] serious medical need with proper medical care, which he failed to do when he

---

[14] In his declaration, Doherty overtly challenges Dr. Ashby's medical opinions on several points. For example, Doherty purports to diagnosis himself with a DVT at the time of his first meeting with Dr. Ashby on March 18, 2019. (Doherty Decl. ¶ 15.) Doherty further purports to diagnosis himself with a PE at the time of his April 22, 2019 visit. (*Id.* ¶¶ 26–28.) In support of this position, he offers his own interpretation of the CT scan that was performed at the hospital on April 21, 2020. (*Id.* ¶¶ 28, 39.) As discussed above, statements of this ilk are insufficient to create a triable issue of material fact because Doherty, a lay person, is incompetent to testify as to the cause of any medical condition, *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001), or interpret medical tests, or otherwise provide a lay opinion, *see Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan J., concurring).

intentionally [and] without medical prudence, delayed . . . testing [for and] treatment of [Doherty's] . . . DVT . . . [for] 35 days." (ECF No. 80, at 5–6.)

To establish an Eighth Amendment claim, an inmate must prove facts that indicate "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Under the objective prong, the inmate must prove that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  "In order to demonstrate such an extreme deprivation, a prisoner must prove 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381).  With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167.  A serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation omitted).

The subjective prong requires the plaintiff to prove facts that indicate a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Deliberate indifference is a

very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed,*

195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a

substantial risk of harm is not enough. The prison official must also draw the inference

between those general facts and the specific risk of harm confronting the inmate."

*Quinones,* 145 F.3d at 168 (citing *Farmer,* 511 U.S. at 837); *see Rich v. Bruce,* 129 F.3d

336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment, the

deliberate indifference standard requires a plaintiff to prove facts sufficient to form an

inference that "the official in question subjectively recognized a substantial risk of harm"

and "that the official in question subjectively recognized that his [or her] actions were

'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303

(4th Cir. 2004) (quoting *Rich,* 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference

to a serious medical need, the treatment must be so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans,* 792 F.2d

1052, 1058 (11th Cir. 1986)), *overruled in part on other grounds by Farmer,* 511 U.S. at

837. "Where a deliberate indifference claim is predicated on a delay in medical care, . . .

there is no Eighth Amendment violation unless 'the delay *results* in some substantial

19

harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)).

The Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with a course of treatment is insufficient to state a cognizable claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### A. Serious Medical Condition

"DVTs can be serious because blood clots in the veins can break loose, travel through the blood stream and lodge in the lungs and block blood flow, which is a PE." (First Ashby Decl. ¶ 9.) In light of this fact, Dr. Ashby concedes that "a DVT constitutes an objectively serious medical need." (ECF No. 125, at 15.) Thus, Doherty has satisfied the objective prong and the analysis may proceed to the subjective prong.

### B. Doherty Fails to Satisfy the Subjective Prong

At its core, Doherty's claim is that Dr. Ashby misdiagnosed him when they met on March 18, 2019. (ECF No. 148, at 17; Doherty Decl. ¶ 16.) He maintains that Dr. Ashby "was deliberately indifferent to [his] statement that [he] knew [he] had a DVT [and] that [he] would like an ultrasound." (Doherty Decl. ¶ 16.) Doherty asserts that Dr. Ashby failed to act with "medical prudence," which delayed him from receiving the appropriate

treatment. (ECF No. 80, at 5–6.)  While the record may, at most, suggest medical malpractice, Doherty has failed to demonstrate that a constitutional violation occurred.

As an initial matter, Doherty's allegation that Dr. Ashby "was deliberately indifferent" to his request for an ultrasound, (*see* Doherty Decl. ¶ 16), is of no value to him on summary judgment.  Simply put, Dr. Ashby's decision not to order the ultrasound did not violate the Eighth Amendment.  As the Supreme Court has long held:

> [T]he question of whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most, it is medical malpractice, and as such the proper forum is in the state court under [the state's laws].

*Estelle*, 429 U.S. at 107; *see also id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").[15]

Further, the fact that Doherty may have had a history of DVTs, which he relayed to Dr. Ashby, does not change the analysis. *See Jackson v. Lightsey*, 775 F.3d 170, 178–79 (4th Cir. 2014).  In *Lightsey*, a non-specialist prison doctor diagnosed an inmate with a less serious condition than an outside cardiologist, and deviated from the cardiologist's recommended treatment, even though the plaintiff "produced or offered to produce medical records showing that a cardiologist had diagnosed and treated him for a more serious condition." *Id.* at 178.  The Court of Appeals for the Fourth Circuit held that,

---

[15] Even if this were not the case, the right to medical treatment is limited to that which is medically necessary and not "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).  Doherty has failed to point to any admissible evidence to demonstrate that any medical professional determined that an ultrasound was needed on March 18, 2019. *See Hudson*, 503 U.S. at 9 (citation omitted) (explaining that prisoners are not entitled to the medical treatment of their choosing).  Thus, Doherty has also failed to show that an ultrasound was medically necessary.

"[t]hough hindsight suggests that [the prison doctor's] treatment decisions may have been mistaken," the claim against the prison doctor is still "essentially" a dispute over proper medical care, which "fall[s] short of showing deliberate indifference." *Id.* (citing *Wright*, 766 F.2d at 849; *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011)).

In deciding *Lightsey*, the Fourth Circuit reiterated that deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* (citation omitted). The Fourth Circuit explained that insofar as the Eighth Amendment is concerned, "it is not enough that an official *should* have known of a risk" to the inmate. *Id.* (citation omitted). This is because "the Constitution is designed to deal with deprivations of rights, not errors in judgment . . . ." *Grayson*, 195 F.3d at 695–96. Simply put, "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *see also Johnson*, 145 F.3d at 168 ("A missed diagnosis . . . does not automatically translate into deliberate indifference." (citation omitted)); *Wester v. Jones*, 554 F.2d 1285, 1286 (4th Cir. 1977) (finding no deliberate indifference where doctor was "negligent in examining [inmate] and in making an incorrect diagnosis").

The Fourth Circuit has made clear that courts should not ask "how obvious a condition must be before a doctor is deliberately indifferent in not diagnosing it," as that

22

question "misses the mark." *Johnson*, 145 F.3d at 168.  Rather, the "correct question"

that courts should ask "is whether the doctor subjectively knows of the serious medical

condition itself, not [merely] the symptoms of the serious medical condition." *Id.*

(internal quotation marks and citation omitted).  "Without evidence that the doctor

'bridged the gap' between the symptoms and the [serious medical condition] itself, [a

plaintiff] cannot survive summary judgment." *Id.* at 168–69.

On this record, affording all reasonable inferences to Doherty, the evidence simply

does not show that Dr. Ashby was deliberately indifferent to Doherty's condition by not

diagnosing him with a DVT on March 18, 2019.  Even if the Court were to credit the

statements of Doherty and Miango that Doherty's leg was swollen and colored at around

the time that Doherty met with Dr. Ashby, *see* Part II.B, *supra*, Doherty's evidence, at

most suggests that Dr. Ashby may have been "negligent in examining [Doherty] and in

making an incorrect diagnosis." *Wester*, 554 F.2d at 1286.  However, a failure to use

sound professional judgment does not constitute deliberate indifference.[16] *Id.*

To the contrary, the record shows that Dr. Ashby offered Doherty substantial care.

Doherty was seen by Dr. Ashby within a few hours of his initial complaint to the guard.

(Doherty Decl. ¶¶ 6–13.)  Dr. Ashby listened to his complaints and his medical history.

(First Ashby Decl. ¶ 10.)  Dr. Ashby observed his gait and examined his lungs.  (*Id.*)  Dr.

Ashby gave him a physical examination, which included feeling the veins in his legs for

possible clots.  (Second Ashby Decl. ¶ 5.)  Dr. Ashby noted tenderness in Doherty's left

---

[16] Consequently, the disputed facts discussed in Part II.B,, *supra*, are not material and they do not preclude a grant of summary judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

thigh and assessed that he was suffering from a strained muscle and an upper respiratory infection. (First Ashby Decl. ¶ 10.)  Dr. Ashby gave Doherty four prescriptions, ordered hotpacks for Doherty's leg, and instructed him to set a follow up visit. (*Id.*)  Thus, even though Doherty may disagree with the treatment that Dr. Ashby provided when they first met, *see Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6), he cannot argue that Dr. Ashby did not provide him with substantial care.[17]

More importantly, Doherty has failed to offer any admissible evidence to establish that when they met on March 18, 2019, Dr. Ashby actually "bridged the gap" between Doherty's symptoms and his DVT, assuming that Doherty even had a DVT at that time. *Johnson*, 145 F.3d at 168–69.  To the contrary, Dr. Ashby affirmatively believed that Doherty did not have a DVT at that time.  (First Ashby Decl. ¶ 10.)  Because Doherty has failed to show that Dr. Ashby subjectively knew that Doherty had a DVT at the time of their first meeting, he cannot show that Dr. Ashby intentionally disregarded that risk.  *See Johnson*, 145 F.3d at 168 (observing that "consciousness of a risk of serious harm is required" (internal quotation marks and citation omitted)).[18]

---

[17] Courts must "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment." *Bowring*, 551 F.2d at 48.  What constitutes adequate treatment "remains a question of sound professional judgment," and "courts will not intervene upon allegations of mere negligence, mistake or difference of opinion." *Id.* (citations omitted).

[18] While Doherty clearly believes that Dr. Ashby should have known that he had a DVT at their first meeting, the Constitution does not impose liability for failing to "alleviate a significant risk that [an official] should have perceived but did not." *Farmer*, 511 U.S. at 838; *see also Lightsey*, 775 F.3d at 178 (noting that "it is not enough that an official *should* have known of a risk . . . ." (citation omitted)).  Thus, "[w]hile a[n] . . . erroneous diagnosis . . . may well represent a deviation from the accepted standard of care, . . . it is insufficient to clear the 'high bar' of a constitutional claim." *Lightsey*, 775 F.3d at 179 (citation omitted).  Doherty's personal beliefs concerning the obviousness of his condition are simply insufficient to establish that Dr. Ashby subjectively knew that Doherty had a DVT on March 18, 2019. *See Johnson*, 145 F.3d at 168.

As for the remainder of Doherty's medical treatment while he was at the ACDF, the record indicates that Dr. Ashby provided Doherty with substantial medical care for the various issues that Dr. Ashby diagnosed, even though Doherty may disagree with his course of treatment. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6).

On April 22, 2019, Dr. Ashby met with Doherty, listened to his complaints and discussed his medical history. (First Ashby Decl. ¶ 13). Dr. Ashby observed Doherty's gait and listened to his lungs. (*Id.*) He conducted a physical examination of Doherty's legs and determined that his left calf had tenderness and slight swelling. (*Id.*) Dr. Ashby assessed Doherty to have "allergic rhinitis due to pollen, mild intermittent asthma, and pain in his left leg." (*Id.*) Dr. Ashby gave Doherty four prescriptions to address those issues and ordered a Doppler scan of his legs. (*Id.*)

Upon determining that Doherty had a DVT, on April 24, 2019, Dr. Ashby prescribed Eliquis, a blood thinner, which is a commonly accepted method of treating DVTs. (*Id.* ¶ 16.) Dr. Ashby opted for this treatment because it was less risky than using a thrombolytic medication, which could cause serious bleeding. (*Id.*)[19]

On May 18, 2019, Doherty saw RN Ekwe "due to what he called PEs." (*Id.* ¶ 17.) Dr. Ashby met with Doherty on May 22, 2019. (*Id.* ¶ 18.) Doherty was not in respiratory

---

[19] While it is curious that Dr. Ashby did not meet with Doherty in person "to explain [his] condition or the medication he prescribed," (*see* Doherty Decl. ¶ 25), Doherty does not dispute that he began receiving his Eliquis "around 4/30/19." (*Id.* ¶ 22.) Doherty has failed to show that Dr. Ashby knew that there was a short delay between the time that he prescribed Eliquis, and the time that Doherty started receiving it. Thus, Doherty has failed to show that Dr. Ashby was deliberately indifferent in this regard. *See Johnson*, 145 F.3d at 168. Further, to the extent that Doherty faults Dr. Ashby for failing to order a "MRI/CT of [his] lungs to rule out PE clots," following the April 22, 2019 visit (*see* ECF No. 148, at 24), Dr. Ashby's "medical decision not to order [additional diagnostic imaging] . . . does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Even if Dr. Ashby erred by not ordering additional imaging, "[a]t most, it is medical malpractice." *Id.*

distress and his vital signs were normal. (Second Ashby Decl. ¶ 7.) Dr. Ashby concluded that Doherty did not have a PE at that time. (*Id.*) "The shortness of breath from a PE would have been much more pronounced" than anything Doherty displayed while at the ACDF. (*Id.* ¶¶ 6–7.)[20]

Based on the admissible evidence before the Court, "[t]here is no indication that [Doherty] had a PE while he was housed at [the] ACDF." (First Ashby Decl. ¶ 19.) "A PE is an emergency condition and the symptoms would have been so severe that he would have been sent out to the hospital on an emergency basis." (*Id.*) Doherty did not require that level of care or exhibit symptoms of a PE while at the ACDF. (*Id.*) Further, a chest x-ray conducted on June 25, 2019, not long before Doherty transferred out of the ACDF, "showed [that his] lungs and pleural spaces were clear." (*Id.* ¶ 21.)

In this instance, the only competent medical evidence in the record indicates that Doherty did not develop a PE until April 20, 2020, long after he had transferred out of the ACDF. (*Id.* ¶ 34.) Further, it appears that Doherty's PE was a result of Doherty's failure to regularly take his prescribed Eliquis while in VDOC custody, "especially from February to April 2020, when numerous doses were missed." (*Id.*)

In any event, Doherty has failed to establish that Dr. Ashby was deliberately indifferent to his serious medical need at their initial meeting, or throughout their subsequent interactions. Accordingly, Claim One will be dismissed.

---

[20] While Doherty complains that Dr. Ashby was hostile towards him because he called Doherty's rationale for requesting an extra mattress "bogus," and because he "angrily" told Doherty that he could not diagnose himself with a DVT (ECF No. 148, at 20; Dohety Decl. ¶¶ 15, 35), this does not establish that Dr. Ashby was deliberately indifferent to his medical needs. *See Douglas v. McCarty*, 87 F. App'x 299, 301 (4th Cir. 2003) (holding that prisoner failed to state a cognizable Eighth Amendment claim where prison medical provider "failed to accurately record [prisoner's] medical condition," and "exhibited a hostile attitude toward him" (citation omitted)).

## IV. CONCLUSION

For the above reasons, the Motion for Summary Judgment (ECF No. 124) will be granted. Claim One and the action will be dismissed.

An appropriate Order shall accompany this Memorandum Opinion.

/s/

HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: March 14, 2022
Richmond, Virginia